**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

UNITED STATES OF AMERICA and
STATE OF NEW YORK,
ex rel. DOMINICK GOLIO, M.D.,

                                 Plaintiff,        **REPORT & RECCOMMENDATION**

   v.                                              16-cv-5363 (DG) (ST)

GEORGE HYMAN, M.D.,

                                 Defendant.
-----------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

## INTRODUCTION

Plaintiff Dominick Golio brings this action as relator on behalf of the United States and the State of New York alleging violations of the federal False Claims Act (31 U.S.C. §3729) and the New York State False Claims Act (NY CLS St Fin § 187) by Defendant, George Hyman. Plaintiff alleges Defendant billed the government through the Medicare and Medicaid programs for medical services he did not actually provide and that he did so knowingly. Both sides have submitted motions for summary judgment. For the reasons contained herein, I recommend both motions be DENIED.

## BACKGROUND

### I. Facts

From January 1, 2011 to December 31, 2012, Dr. Hyman, the Defendant, was the sole owner of a medical practice called Brooklyn Medical Eye Associates (BMEA). Pl. R. 56. 1 Br. ¶ 1, ECF No. 78-12; Def. R. 56.1 Repl. Br. ¶ 1, ECF No. 79-1. Defendant had substantial

1

knowledge and training regarding billing compliance due to his long tenure in the medical field, which included being appointed the chairman of the Department of Ophthalmology at Brookdale University Hospital Medical Center. *Id.* at ¶ 2.

Brookdale Hospital ran an Eye Clinic which serviced individuals who were on both Medicare and Medicaid health insurance. *Id.* at ¶ 32. The Clinic did not have the testing equipment required to perform two different procedures for Clinic patients: Heidelberg Retina Tomograph (HRT) scans and Fundus Photography scans. *Id.* at ¶¶ 4, 32. To perform these procedures, some Clinic patients were referred to Dr. Hyman's private practice (BMEA) which did have the equipment necessary. *Id.* at ¶ 5-6. However, BMEA did not interpret or diagnose based upon the scans or photos performed on any Clinic patients relevant to this action. *Id.* at ¶ 7. That was done by Brookdale Hospital residents who used the scans and pictures to interpret and diagnose Clinic patients. *Id.* at ¶ 8.

Prior to 2011, BMEA reported these procedures for Clinic patients to Medicare and Medicaid using Current Procedural Terminology (CPT) codes "92133-TC" for HRT scans and "92250-TC" for Fundus Photo scans. *Id.* at ¶ 9. The TC modifier used at the end of these CPT codes denotes that the government is to be billed only for the technical component of the scans (the use of the machine to perform the scan) and not for the interpretation, consultation, or diagnosis based upon the scans (known as the "professional" component). *Id.* at ¶ 10. Without a modifier, CPT codes "92133" and "92250" denote that the government is to be billed for both the technical and professional portions of the procedures (known as a "global" rate). *Id.* at ¶¶ 10, 22. The global rate requires greater reimbursement from the government than just the technical component rate. *Id.* at ¶ 23. Medicare and Medicaid are overcharged when the global rate is billed and no professional component is performed on HRT and Fundus Photo scans. *Id.* at ¶ 24.

2

In 2011 and 2012, Porteck Corporation was in a contractual relationship with BMEA. *Id.* at ¶ 12. While BMEA and Defendant remained responsible for billing compliance, Porteck Corporation performed billing services for BMEA. *Id.* at ¶ 12, 16. Under this arrangement, BMEA would prepare what were called "superbills" which contained billing information for each patient and send them to Porteck to submit the bills to payers, including for Medicare and Medicaid reimbursement. *Id.* at ¶ 14.

In the years relevant to this action, 2011 and 2012, Medicare and Medicaid should have been billed only for the technical component for HRT and Photo scans performed on Clinic patients referred to BMEA and included in this action. *Id.* at ¶¶ 7, 30. The parties agree that in those years, Medicare and Medicaid appear to have been overbilled for these patients. *Id.* at ¶ 32. On December 31, 2012, Plaintiff purchased BMEA from Defendant. *Id.* at ¶ 39.

That is about as much as the parties agree on. Plaintiff has put into the record evidence of what he claims are 549 superbills prepared by BMEA for Clinic patients who only received the technical component of HRT and/or Fundus scans. *See* Storms Dec., Exh. 5, ECF Nos. 78-6, 78-7. The documents show Dr. Hyman's name circled at the top, "Clinic" written by hand at the top of each form, and either the global Fundus or global HRT scan code circled without a modifier. *Id.* Plaintiff has also put into evidence Medicare and Medicaid payment records received from the government which he alleges show that the government paid out for both the technical and professional components of the scans for these Clinic patients, who only received the technical service. *See* Storms Dec., Exhs. 15-18, ECF Nos. 78-10, 78-11, 80-2, 80-3. It is Plaintiff's allegation that these superbills with improper global billing codes were sent to Porteck by Defendant who knew that Porteck would overbill the government by submitting for payment for both the technical and professional components of the procedures when only the technical

3

component was performed. Plaintiff also alleges that after he bought BMEA at the end of 2012, he discovered the overcharging and confronted Dr. Hyman, who responded "don't tell me what to do." Golio Dec. ¶¶ 8-10, ECF No. 78-3. He says he also caught Defendant, who remained a doctor at BMEA in subsequent years, modifying superbills that did include modifiers by scribbling out the modifiers. *Id.* at ¶¶ 13-15.

Defendant presents a very different version of events. Defendant says that in 2011, Porteck was tasked with revising the superbill used in the BMEA office. Def. R. 56.1 Br., ¶ 8. Eventually, Defendant became frustrated by Porteck's delays in producing a satisfactory form and so decided to adopt a draft superbill form Porteck had proposed on which Porteck omitted a "TC" billing modifier. *Id.* at ¶ 10. To work around the omission, Defendant claims he spoke with an account representative from Porteck and they agreed that Defendant would have office staff write "Clinic" on superbills associated with Clinic patients who only received technical services. That would signify to Porteck that it was to bill only for the technical component even where what was circled on the superbill was the global billing code. *Id.* at ¶¶ 11-12.

Defendant says he never received any indication that Porteck was improperly billing based on these superbills as it was Porteck and not him who received detailed payment remittance documents. All he received from Porteck were summaries which did not differentiate Clinic patients from BMEA private patients, and so he had no way of knowing that Clinic patient claims were being improperly submitted. *Id.* at ¶¶ 15-16. Defendant says it was only in January of 2014, a year after Plaintiff took over BMEA, that the superbill form was changed, and that any overbilling continued through 2013 while Plaintiff owned BMEA. *Id.* at ¶¶ 24-30. He additionally, in his declaration, denies Plaintiff's allegations that Plaintiff and Defendant met and spoke about the overbilling. Hyman Dec., ¶¶ 31-32, ECF No. 79-2. He also argues that his

scribbling out of the modifier on later superbills after Plaintiff took over BMEA was proper, as it was for procedures of a different kind in a different office. *Id.* at ¶ 45.

Defendant also contests Plaintiff's computation of damages. He says the actual number of claims, when comparing Plaintiff's submission of superbills from 2011 and 2012 to the government source data, is 334 claims, not the 549 claims Plaintiff alleges. Hyman Repl. Br., ¶ 16, ECF No. 81. He also says the calculated reimbursement amount Plaintiff shows in his damages table in his brief is a total reimbursement amount for the claims, not the difference between the payout under the global code for these claims versus what the payout would have been under the claim with a technical-procedure-only modifier. *Id.* at ¶ 14.

There is also much back and forth about the motivations of this lawsuit and how it relates to other legal disputes between these parties, none of which is relevant to the instant action.

Both parties have moved for summary judgment on Plaintiff's two claims, that Defendant violated the Federal False Claims Act and the New York State False Claims Act.

**LEGAL STANDARD**

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if the fact "might affect the outcome of the suit under the governing law…" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists as to a material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On motions for summary judgment, the moving party bears the initial burden of establishing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party meets that burden, the non-moving party must then show there is a

5

genuine dispute for trial. *Id.* The burdens on both parties as to the underlying elements are aligned as they would be at trial. *Id.* at 254.

When considering a motion for summary judgment, the Court must construe "all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## DISCUSSION

The False Claims Act makes liable a defendant who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval", "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government…" 31 U.S.C. § 3729(a)(1)(A),(B),(G).

The False Claims Act defines knowingly as "(1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity." *United States ex. Rel. Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001) (citing 31 U.S.C. § 3729(b)). "Knowingly" under the Act "require[s] no proof of specific intent to defraud." *Id.* at §3729(b)(1)(B). The Second Circuit has found that Medicare reimbursement forms are claims to the United States government under the False Claims Act. *Mikes,* 274 F.3d 695-96 (citing *United States v. Krizek,* 111 F.3d 934, 940 (D.C. Cir. 1997)).

The New York State False Claims Act "is closely modeled on the federal FCA" and "New York courts rely on federal FCA precedents when interpreting the NYFCA." *United States ex. Rel. Bilotta v. Novartis Pharms. Corp.,* 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014) (quoting

6

*U.S. ex. Rel. Pervez v. Beth Israel Med. Ctr.,* 736 F. Supp. 2d 804, 816 (S.D.N.Y. 2010)). Therefore, the same analysis applied below to the Federal FCA applies in equal measure to Plaintiff's New York State FCA claims.

The parties appear to disagree on a few elements of the alleged FCA violation. Defendant argues that Plaintiff has put forward no admissible evidence of false claims made to the U.S. government and that this failure is fatal to his claims, entitling Defendant to summary judgment. *See* Def. Br., 3-6, ECF No. 79-8. In the alternative, Defendant argues that Plaintiff has not put forward sufficient evidence to support his claim that Defendant *knowingly* provided false or fraudulent statements to the government and, thus, summary judgment for him is warranted. *Id.* at 7-25.

Plaintiff meanwhile argues that no reasonable jury could find Defendant did not make or cause to be made false or fraudulent statements to the government, nor that he did not do so knowingly. Pl. Br., 11-21, ECF No. 78-1. Though Plaintiff seeks summary judgment on all claims, he explicitly asks the Court, if it is not willing to do that, to grant summary judgment on "all elements of Defendant Hyman's violations of the FCA and NY FCA other than whether Defendant Hyman violated the CA and NY FCA 'knowingly…'"

## I. False or Fraudulent Claims to the Government

The parties dispute whether Plaintiff has submitted any admissible evidence of false or fraudulent claims made to the government and, if so, whether the evidence put forward establishes false or fraudulent claims were submitted to the government sufficient to support Plaintiff's motion for summary judgment.

Plaintiff submits a variety of evidence to establish the government was sent false or fraudulent claims by Porteck on behalf of BMEA. The first piece of evidence he submits are 549

7

"superbills" prepared by Dr. Hyman's practice (BMEA) during the years of 2011-2012, which he claims are the 549 false claims at issue in this action. *See* Storms Dec., Exh. 5, ECF Nos. 78-6, 78-7. These superbills each relate to a Clinic patient who was seen for an HRT eye scan and/or Fundus photo scan by BMEA. On these superbills the global code is listed for each of these procedures and it is circled, but no modifier, such as "TC," is included to indicate only the technical component should be billed and not the consultation component, even though parties agree that the Clinic patients at issue in this action only received the technical component of the procedure. At the top of each of these superbills, the word "clinic" is written. *Id.*

The parties agree that these superbills were not what was submitted to the government. Pl. R. 56.1 Br., ¶ 14; Def. R. 56.1 Repl. Br., ¶ 14. The superbills were instead submitted to a third-party company called Porteck Corporation which used the superbills to create the claims that were submitted to the government. Plaintiff has not submitted any evidence of Porteck's actual submissions to the government.

However, Plaintiff has received Medicare and Medicaid payment information from the government pursuant to subpoenas issued in this case. He has submitted summaries of the information received as evidence. *See* Storms Dec., Exhs. 15, 16, ECF Nos. 78-10, 78-11. The summaries also include the procedure codes under which the claims were paid out, all of which are global codes for the HRT or Fundus photo scans without any "TC" or "26" modifiers which the parties agree would be included for payments only for the scans themselves and not for consultations. *Id.*; Pl. R. 56.1 Br., ¶ 21; Def. R. 56.1 Repl. Br., ¶ 21. Because the global codes appear on Medicare and Medicaid payment information, the summaries make it appear that the government paid out for both the technical and consultation portions of the scans – an amount

8

the parties agree was more than should have been paid out for just the technical procedure (i.e. the only work that was done with Defendant's Clinic patients).

Defendant argues these summaries are not admissible based upon Rule 1006 of the Federal Rules of Civil Procedure which requires, for a summary to be admissible, that "the proponent must make the originals or duplicates available for examination or copying, or both…" Fed. R. Civ. Pr. 1006; Def. Br., 3-4. However, Plaintiff subsequently published the originals to the docket (*see* Storms Dec., Exhs. 17, 18, ECF Nos. 80-2, 80-3), mooting this issue. The underlying data submitted also includes procedure codes which appear to match up with the global codes on the superbills Plaintiff submitted in Exhibit 5.

Defendant also argues the underlying government data is inadmissible hearsay, that Plaintiff therefore has submitted no evidence of any false claims being submitted to the government, and thus he is entitled to summary judgment because no reasonable jury could find Plaintiff has proven an essential element of his claim. Def. Br., 4-5.

Under Federal Rule of Civil Procedure 803(8) a public record is not hearsay if it sets out the office's activities, a matter observed while under a legal duty to report, or factual findings from a legally authorized investigation. Fed. R. Civ. Pr. 803(8). The only way a public record which sets out a public office's activities could be excluded under 803(8) would be if the opponent had shown a lack of trustworthiness for the document. *Id.* at 803(8)(B). Under Rule 803(6) of the Federal Rules of Civil Procedure, an out of court record utilized for the truth of the matter asserted is admissible if it is a record of a regularly conducted activity and a custodian testifies that it was made at or near the time of an event by someone with knowledge, it was kept in the course of a regularly conducted activity, and making the record was the regular practice of the activity. Fed. R. Civ. Pr. 803(6)

Here, declarations were submitted by the federal and state governments with the records. The federal government certification says, "I hereby certify that the annexed consists of the complete file in the possession of the Department of Health and Human Services" and is signed by Victoria Abrile, the Associate Regional Administrator for the Centers for Medicare and Medicaid Services. *See* Storms Dec., Exh. 15. The state certification includes an attestation that they are original records "made in the regular course of business of NYS Department of Health and that it was the regular course of business of NYS Department of Health to make such records at the time of the recorded act(s)…or within a reasonable time thereafter." *See* Storms Dec., Exh. 16. It is signed by Jody Spillane, the MDW CCC Support Specialist with the Department of Health. *Id.*

It appears from these attestations that both records pass muster under FRCP 803(8) and would be admissible at trial under that rule. Both set out the offices' respective activities, which include documenting and paying claims submitted to Medicare and Medicaid. The records are attested to by public officials that they are records of public offices and they both set out that they are the full HHS and DOH files. Defendant has not shown the source of the information or other circumstances indicate a lack of trustworthiness in any way. Additionally, based on the attestation of Ms. Spillane, the state records would also likely pass muster under FRCP 803(6). Therefore, they are admissible, and Defendant's contention that no admissible evidence of false or fraudulent claims to the government is in the record, fails.

However, Defendant also makes a third argument as to why the Court should find Plaintiff has not met his burden to show evidence of false claims. Defendant swore in his reply declaration that the Medicare source data (Storms Dec. Exh. 17) includes not just claims for Clinic patients, but also claims for private patients he saw. He attests that he regularly used

10

billing modifiers with his private patients during 2011 and 2012. Yet, in the source data, no modifiers appear in any of the procedure codes. Hyman Repl. Dec., ¶¶ 7-9, ECF No. 81. It is his contention then that the data may not in fact be evidence of false claims to Medicare because it may show global codes for procedures regardless of whether they were submitted by Porteck with modifiers or not. He does not make the same argument with respect to the Medicaid source data, which does show modifier codes on some claims. Storms Dec., Exh. 18.

It is clear that factual issues predominate on whether false or fraudulent claims were submitted by Porteck to the government for Medicare reimbursement on behalf of BMEA between 2011 and 2012. A jury may believe Dr. Hyman that he regularly submitted modifiers for his private patients in 2011 and 2012 and that, because those do not appear in the Medicare source data, no record of modifiers whether they were submitted or not appears in the source data. A jury may then find that Plaintiff has not met his burden to establish this essential element as to the Medicare claims. Or, a reasonable jury could decide it does not believe Dr. Hyman and in fact believes he was not submitting modifiers with his private clients claims either. Or a reasonable jury could find Porteck was not following Mr. Hyman's instructions and, even though he believed the claims for private clients were being submitted with modifiers, they in fact were not and the Medicare data is indeed accurate. The point is, the record does not establish the answer to whether the government received false or fraudulent Medicare claims for Clinic patients on Medicare who were seen by BMEA in 2011 and 2012. Because a reasonable jury could find either way on this element for the Medicare claims, summary judgment is not appropriate.

However, it appears Plaintiff has at least met his initial burden on this element on the Medicaid claims. The "superbills" prepared for clinic by CMEB had the global billing codes

11

circled. Storms Dec., Exh. 5. The government Medicaid records show that many of the cases those superbills corresponded to were paid out under global procedure codes without modifiers. Storms Dec., Exh. 18. And, Defendant himself admits his office did not "interpret or diagnose" the HRT or Fundus photo reports for the Clinic patients relevant to this action. Def. R. 56.1 Repl. Br., ¶ 7. While it is possible that Medicaid records omitted the modifiers as Dr. Hymen suggests, it is equally plausible that the records do not contain modifiers because Medicaid paid the global (and therefore overbilled) amount. Resolving all reasonable inferences in Plaintiff's favor, a reasonable jury could certainly conclude that CMEB's third-party contractor submitted at least some of the clinic patients' scans to Medicaid for payment as HRT and Fundus scans and consultations, when in reality all that was done were the scans. Such instances of overbilling would establish the false claim element. Thus, Defendant cannot be granted summary judgment on the basis that Plaintiff has not supported an essential element of his case with any admissible evidence.

Given the genuine factual discrepancies regarding the actual claims submitted to the government, summary judgment on this issue is not appropriate.

**II.      Knowledge**

Genuine disputes of materials facts also preclude summary judgment on the issue of Defendant's knowledge.

Plaintiff's theory of the case is that Defendant caused these false claims to be submitted to the government by submitting superbills with false procedure codes to Porteck, which ensured the claims were false when they were submitted to the government according to the notation on the superbills, and that he did so knowingly. *See* Pl. Repl. Br., 1-6, ECF No. 80-6.

Under the FCA, causing false claims to be filed with the government is not enough. The violation must be done knowingly which, under the FCA, is defined as either "(1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity." *Mikes,* 274 F.3d at 696. The Second Circuit has held that the "requisite intent" under the FCA "is the knowing presentation of what is known to be false as opposed to negligence or innocent mistake." *Id.* at 703 (internal quotations omitted).

Plaintiff argues he is entitled to summary judgment on all three of the forms of knowledge included under the FCA. Defendant argues Plaintiff has not shown that no reasonable jury could find Defendant acted at most negligently and that, in fact, no reasonable jury could find Defendant acted knowingly.

I will deal with each side's motion separately, construing the burdens, facts, and inferences appropriately based upon which party is the moving party. I note at the outset that state of mind issues like this are often closely tied to ultimate factual issues, reserved for the finder of fact. The Second Circuit Court of Appeals has been "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences" because such issues are "appropriate for resolution by the trier of fact." *Meijer, Inc. v. Ferring B.V.*, 585 F.3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

### a. Plaintiff's Motion

Plaintiff bears the burden at trial, so he has the initial burden of establishing the absence of a material fact that Defendant's actions were done knowingly. He puts forward multiple theories to establish Defendant's knowledge. Construing all facts and ambiguities in the Defendant's favor, I recommend the Court find none sufficient to grant summary judgment to Plaintiff.

13

### i. Actual Knowledge

Plaintiff contends no reasonable jury could find Defendant did not have actual knowledge that false claims were being submitted. He offers three theories for this: Porteck's knowledge can be imputed to Defendant under an agency theory, Defendant demonstrated specific intent with subsequent actions, and that no agreement with Porteck to include modifiers ever existed. Pl. Br., 15-21.

Plaintiff's first theory does not pass muster. Even if Porteck's knowledge upon filing the claims could be imputed to Defendant, Plaintiff has put no evidence in the record that Porteck knew the claims it was filing were false. If Porteck did not know the claims it was filing were false, it did not have actual knowledge of the falsity, and thus no knowledge of falsity could be imputed upon Defendant.

Second, Plaintiff argues that Defendant demonstrated specific intent to defraud the government by "knowingly and intentionally scribbl[ing] out the -TC modifiers to bill the global rate" in subsequent years while Plaintiff owned BMEA. Pl. Br., 23. He cites to Exhibit 12 for this contention, which shows some of Dr. Hyman's superbills from 2013-2015 with global codes circled and the "TC" modifier crossed out. Storms Dec., Exh 12, ECF No. 78-9.

First, however, these superbills are not from the same time period as the false claims alleged by Plaintiff which are from 2011 and 2012. *See id.*, Exhs. 5, 15-16. Therefore, they are not proof of Defendant's mental state at the time the false claims at issue in this action were actually filed. Moreover, Defendant has explained the modifications to the superbills in a way a reasonable jury could credit. He testified under oath that these superbills were, unlike the superbills at issue in this action, from the Flatbush office (which is circled on the superbills) which did not see Clinic patients. Def. R. 56.1 Br., ¶ 42. Therefore, a reasonable jury could find

14

that action was not only not indicative of knowledge, but actually proper because, as opposed to Clinic patients, he may indeed have been entitled to bill for the global component in those cases.

Plaintiff also points out that Defendant approved the superbill form which omitted the TC modifier. Pl. Br., 18.  But Defendant swears that this form was created by Porteck and that he had discussed a system with Porteck whereby when he saw a clinic patient for scans, he would mark the superbill at the top with "clinic" which Porteck then was supposed to bill with a TC modifier. Hyman Dec., ¶¶ 12-13.  Plaintiff contends this agreement never occurred. Pl. Br.,3, fn. 2.  If this agreement never occurred, then Dr. Hyman, by admitting he knew that these claims should have been billed with a TC modifier, would have actual knowledge Porteck would file these false claims and, by his office sending them to Porteck, would have caused those false claims to be filed.

To grant Plaintiff's motion based on this theory of actual knowledge, the Court would need to assess Dr. Hyman's credibility and find him to be a witness whose sworn testimony cannot be credited.  "As a general rule, district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage. Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Randolph v. Griffin,* 816 Fed Appx. 520, 523 (2d Cir. 2020) (citing *Jeffreys v. City of New York,* 426 F.3d 549, 551 (2d Cir. 2005)); *see also Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 622 (2d Cir. 1999).  I do not find Dr. Hyman's testimony to be so "contradictory or rife with inconsistencies such that it was facially implausible" that it cannot be credited on summary judgment. *See Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712, 726 (2d Cir. 2010).

Though Porteck's COO and Reena Patel, Defendant's account representative at Porteck, testified they did not recall any special billing instruction from Defendant (*see* Storms Dec., Exh.

15

6, 34; Exh. 7, 17), Defendant has sworn that his patient billing protocol was established with a Porteck witness who was not deposed, one Kanan Barot. *See* Def. R. 56.1 Repl. Br., ¶ 38. And Defendant has put forward the testimony of Pamela Knibbs, his former office manager, who swore that she "had conversations with Kanan Barot of Porteck, in which we discussed the fact that superbills marked 'Clinic' on the top were to be billed only for the technical component, as Dr. Hyman had arranged. We had these conversations several times, and it was my understanding that Ms. Barot knew that BMEA could bill only for the technical component for superbills marked 'Clinic.'" Knibbs Dec., ¶ 17, ECF No. 79-7. Whatever the Court may think about which side has the more credible argument, it cannot substitute its findings for the trier of fact on summary judgment. The jury will have to assess the credibility of these witnesses, and a reasonable jury could find the evidence from either side credible.

Thus, Plaintiff has not met his burden to show actual knowledge.

### ii. Deliberate Ignorance or Reckless Disregard of Truth or Falsity

Next, Plaintiff argues there is not genuine question that Defendant demonstrated deliberate ignorance or reckless disregard to the truth or falsity of the claims at issue in this action. The deliberate ignorance and reckless disregard standards are intended to capture "an individual [who] has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *United States ex rel. Taylor v. Gabelli,* 345 F. Supp 2d 313, 330 (S.D.N.Y. 2004) (quoting *Mikes*, 84 F. Supp 2d at 438). Congress' purpose in including these mental states was to "impose upon individuals and contractors receiving public funds 'some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id.* In assessing whether action or inaction rose to the level of reckless disregard, courts throughout the country have considered several factors including the

16

defendant's adherence to custom, existing knowledge or expertise, any legal or expert advice the defendant received, disclosure to the government, guidance from an administrative agency or court, and the reasonableness of the defendant's actions. James Wiseman, *Reasonable, but Wrong: Reckless Disregard and Deliberate Ignorance in the False Claims Act After Hixson,* 117 Col. L. Rev. 435, 450-51 (2017).

Plaintiff argues that Defendant failing to bill pursuant to the Medicare Claims Processing Manual by not including the TC modifier and his complete failure to review his billing records for errors constituted reckless disregard and/or deliberate indifference to the falsity of claims filed on his behalf. Pl. Br., 15-21.

Defendant admits that he did not review billing records or explanation of payment forms but says that is because he did not receive them. Def. R. 56.1 Br., ¶¶ 34-35. He also contends he had no basis or reason to believe or suspect that BMEA was overbilling Medicare or Medicaid. *Id.* at ¶ 36. Construing all factual inferences in favor of Defendant, the question then is whether a reasonable jury could find his failure to seek out those records to review whether claims were being filed accurately was at most mere negligence.

Construing all facts and inferences for Defendant, I believe a reasonable jury could make that determination. It is Defendant's testimony that he did not bill the government, Porteck did. He merely created superbills to send to Porteck to use to file claims. Defendant swore under oath he had a billing protocol with Porteck to bill the superbills marked "Clinic" only for the technical component of the scans. Hyman Dec. ¶¶ 14-15. He swore that he ensured all superbills from the Clinic were marked in this way and all those submitted by Plaintiff were. *Id.* at ¶¶ 16-17. He swears that the revenues generated by diagnostic testing for clinic patients were only a minute portion of BMEA overall practice revenue, less than 1.9%, and thus the difference in

17

payment due to improper billing would not have been noticeable. *Id.* at ¶ 22; Hyman Repl. Dec. ¶ 19. Indeed, the total reimbursement amount for all the global claims at issue in this action were $22,608 in Medicare claims and $16,920 in Medicaid claims according to Plaintiff. *See* Pl. Br., 25. Defendant testified that Porteck received all detailed payment remittance documents and that, though it sent him summaries of collections for BMEA, those summaries did not differentiate clinic patients from private patients, so he would have had no way to know the government was overpaying for Clinic claims. *Id.* at ¶¶ 22-23.

Granting all this to Defendant, a reasonable jury could find there was no reason for him to believe these claims were being billed improperly and that his failure to look at how Porteck was billing the government for Clinic patients was not the result of him deliberately burying his head in the sand or disregarding a known risk, but merely failing to do the accounting that a reasonable person should have done to ensure the accuracy of a third-party agent, or, at most, negligence.

Thus, as Plaintiff has not established that there is no genuine dispute as to an element of its claim, that Defendant knowingly caused the false claims to be filed, I recommend his motion for summary judgment be denied.

      b.      **Defendant's Motion**

However, Defendant has also not met his burden to show no reasonable jury could find he did knowingly cause the false claims to be filed.

The parties agree that Defendant was experienced in the medical billing field. Pl. R. 56.1 Br., ¶ 2; Def. R. 56.1 Repl. Br., ¶ 2. A reasonable jury could find it was reckless disregard for such an individual to send an inaccurate superbill to the company that files claims to the government. A reasonable jury could also find that failing to make any simple inquiry of

18

Porteck as to how they were in actuality filing these claims over the course of two years was deliberate ignorance.

Moreover, a reasonable jury could credit Plaintiff's evidence that no special billing arrangement with Porteck existed and find Defendant actually knew these false claims would be filed with the government based on the superbills his office prepared.

As such, Defendant has not met his burden to show that Plaintiff could not establish this element at trial and thus, summary judgment for Defendant should also be denied.

## CONCLUSION

As Plaintiff has not met his burden to show no reasonable jury could find against him on any of the elements of his False Claims Act claims and Defendant has not met his burden to show Plaintiff has filed to make out a prima facie case on any element, I recommend that Plaintiff's and Defendant's cross motions for summary judgment both be denied.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Central Islip, New York
       September 9, 2022